IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FEB 2 6

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:10MJ130 |
| | ) | |
| JONATHAN PAI, | ) | |
| | ) | |
| TOFUN ALI GHASRI, | ) | |
| | ) | |
| PAUL BANG, | ) | |
| | ) | |
| JEFF L. TSU, | ) | |
| | ) | |
| QUANG HUY HO, | ) | |
| also known as "G," | ) | |
| | ) | |
| Defendants. | ) | |

<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT</u>

I, Edmund J. Kelly, a Special Agent of the Virginia State Police and sworn as a Task Force Officer with the United States Drug Enforcement Administration (DEA), being duly sworn, state as follows:

1.      This affidavit is made in support of a criminal complaint charging Jonathan Pai, Tofun Ali Ghasri, Paul Bang, Jeff L. Tsu, and Quang Huy Ho, also known as "G," with conspiracy to distribute:

> (1)     a mixture and substance containing a detectable amount of 3,4 methylenedioxymethamphetamine (MDMA), commonly known as Ecstasy;

and

> (2)     100 kilograms or more of a mixture and substance containing a detectable amount of marijuana.

1

in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and for an arrest warrant for Jeff Tsu.

2.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516(1) of Title 18, United States Code.

3.      I have been a Special Agent with the Virginia State Police for over 14 years and a sworn Task Force Officer with the DEA for over 5 years.  As a Special Agent with the Virginia State Police assigned to the DEA, I have participated in investigations involving unlawful narcotics distribution.   I have participated in the execution of numerous search warrants, which resulted in the seizure of controlled dangerous substances and the seizure of narcotics proceeds.   Through these investigations, information gathered from experienced agents, and training, I have become familiar with the methods used by individuals engaged in narcotics trafficking.  Through investigations and training, I have also become familiar with the use by drug traffickers of telephones to communicate, the patterns of activity of drug traffickers, the types and amounts of profits made by drug dealers, and the methods, language, and terms that are used to disguise the activities and nature of the profits from their illegal drug dealings.

4.      The information contained herein is based on personal knowledge, information provided to your affiant by sworn law enforcement officers, and information obtained public records, cooperative witnesses, and other sources as indicated herein.

5.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance and in part and is not

2

intended to be a verbatim recitation of such statement. Additionally, wherever in this affidavit I quote statements made by an individual that were intercepted pursuant to court-authorized wiretaps, those quotations have been taken from draft transcripts of those statements which are subject to further revision. Moreover, this affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts, which are necessary to establish probable cause that the charged offenses have been committed.

6.     Throughout this investigation, law enforcement officers and agents have worked together to gather and record information about the illegal activities of those under investigation. This affidavit is based in part on my personal knowledge derived from my participation in this investigation and in part on information provided by other officers and agents who have participated in this investigation. This affidavit also contains information obtained from a Montgomery County Police Department Detective sworn as a Task Force Officer with the Drug Enforcement Administration acting in an undercover capacity. The conversations have been relayed in this affidavit in substance and in part. As such, the conversations relayed in this affidavit are not intended to be considered verbatim recitations

## PROBABLE CAUSE

This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed or known to the government.

3

7.     On February 18, 2009, your affiant conducted an undercover operation in conjunction with Virginia State Police Drug Enforcement Section (VSP), Drug Enforcement Administration (DEA) Group 10 and the Montgomery County Police Tactical Narcotics Unit (MCPD) to purchase 100 MDMA pills from Jonathan PAI in the Eastern District of Virginia in exchange for $1,200.

8.     On February 18, 2009, an undercover officer arranged to meet PAI at 7850e Tysons Corner Center, McLean, Virginia, the Tysons Corner mall parking lot.  PAI instructed the undercover officer to meet him at the top parking garage level facing the AMC movie theatres and TGI Fridays.  The undercover officer arrived on scene at approximately 20:45 hours, called PAI at (703) 623-3963 and told PAI that he was there and waiting.  At approximately 20:53 hours, the undercover officer met with PAI, and the undercover officer handed PAI $1200.00 in VSP Official Authorized Funds (OAF) inside of a Camel Light Cigarette box.  PAI in turn gave the undercover officer two separate bags of blue dolphin imprint MDMA pills.  PAI stated that "his man" had given him both bags.  The undercover officer had a brief conversation with PAI concerning future purchases of MDMA, and then, the undercover officer departed the area.  The undercover officer positively identified the target as John PAI from a photograph obtained by your affiant from the Virginia Department of Motor Vehicles.

9.     On February 26, 2009, members of the DEA, VSP and the MCPD conducted two controlled purchases of MDMA tablets from PAI.  The controlled purchases of a total of 321 suspected MDMA pills were made by a narcotics detective of the MCPD acting in an undercover capacity.  At approximately 19:37 hours, surveillance agents observed two males walk out of the front door of PAI's residence in Fairfax, Virginia,

4

and get into a silver-colored Toyota Highlander, and depart from the area. PAI was identified by surveillance as the driver of the vehicle. Surveillance team members observed the Toyota Highlander arrive on the top level of the parking garage adjacent to the AMC movie theatre entrance and the T.G.I. Fridays restaurant located at 7850e Tyson's Corner Center, McLean, VA. At approximately 19:58 hours, your affiant observed PAI approach the vehicle and make contact with the undercover officer. The undercover officer purchased 300 MDMA tablets. The undercover negotiated with PAI to purchase an additional 21 MDMA tablets for $250.00, and PAI agreed to return with them shortly. PAI left the area, later returned, and sold the undercover officer the additional 21 tablets of suspected MDMA for $250.00.

10.     On March 26, 2009, members of the DEA, VSP and the MCPD conducted an undercover controlled purchase of 1,000 MDMA tablets from PAI.

11.     On June 11, 2009, members of the DEA, VSP and the MCPD conducted an undercover controlled purchase of 500 MDMA tablets from PAI. Surveillance was established on PAI's residence in Fairfax, Virginia, following a recorded conversation between PAI and the undercover officer. During the conversation, PAI agreed to meet the undercover at the Tysons Corner Mall to sell him approximately 500 MDMA pills. The surveillance team observed a silver-colored Jeep Cherokee pull up to PAI's residence. TFO Farhan observed the silver-colored Jeep and the silver-colored Toyota Highlander driven by PAI depart from the residence. TFO Farhan and SA Sponheimer followed the two vehicles, which traveled together to the Tysons Corner Mall in McLean, Virginia, where the deal occurred.

12. On August 13, 2009, members of the DEA, VSP and the MCPD conducted an undercover controlled purchase of 400 MDMA pills from PAI. On August 13, 2009, surveillance was established in the vicinity of PAI's residence in Fairfax, Virginia. Surveillance observed PAI leaving his residence wearing a white t-shirt and carrying a black bag. PAI drove the same silver-colored Toyota Highlander observed on previous surveillance operations. During the meeting, PAI told the undercover officer that he had an additional 300 pills for sale. The undercover officer agreed to purchase the 300 additional MDMA pills, and PAI told the undercover he would retrieve them and return as soon as possible. PAI left, and a little more than an hour later, after being observed traveling to the vicinity of his residence, PAI was seen returning to the meeting where the undercover officer purchased approximately 300 additional MDMA pills from PAI.

13. After this transaction, your affiant and SA Luke McGuire observed PAI get out of the undercover vehicle at approximately 15:32 hours, and your affiant and SA McGuire observed PAI pass his cellular telephone to the undercover officer who had asked to speak with PAI's source of supply. PAI remained outside the undercover vehicle by the front passenger side door as the undercover talked to PAI's source of supply (hereafter "CC-1"). During the conversation, the undercover asked CC-1 if they could deal with each other directly, but CC-1 told the undercover to continue placing his orders through PAI. CC-1 told the undercover that he would receive a reduced price for future purchases. CC-1 indicated to the undercover that they could meet sometime in the future after additional deals were conducted but did not commit to a specific date or number of deals in order for this meeting to occur. Your affiant and SA McGuire observed the undercover pass the cell phone back to PAI. A subsequent analysis of the

toll records for PAI's cellular phone number revealed that at approximately 15:31 hours, PAI dialed the phone number subscribed to CC-1. Your affiant and SA McGuire observed PAI walk away from the undercover vehicle and to his Toyota Highlander where PAI got into his vehicle and departed the mall area. The surveillance team followed PAI as he traveled back to his residence in Fairfax, Virginia.

14.     Beginning on November 20, 2009, and continuing until approximately December 18, 2009, and then again from January 12, 2010, until February 9, 2010, the DEA was engaged in court-authorized interception of wire and electronic communications on both PAI and CC-1's telephones.

15.     On November 24, 2009, at approximately 18:15 hours, the undercover officer contacted PAI, telling PAI that he was interested in making an MDMA purchase. PAI referred to an order he made previously, telling the undercover officer that "it wasn't all for you, but we got rid of it anyway, so we're about to probably re-up soon, so if you want to place an order now, you know, that would be great." PAI also reminded the undercover officer that he (PAI) sent a text message and possibly a voicemail message to the undercover officer two or three weeks earlier regarding an order for 2,000 pills. The undercover officer told PAI that he was interested in placing an order but was looking to receive a purchase price of $5 per pill. PAI told the undercover officer that he would get back to him within a couple of hours.

16.     Approximately 10 minutes later, PAI contacted CC-1 by telephone. PAI relayed to CC-1 that the undercover officer wanted a purchase price of $5 per pill, a significant reduction in price from his previous purchases. CC-1 told PAI that the undercover officer would have to front half the money in order to receive such an order.

7

CC-1 told PAI that he told the undercover officer that he would have to make a down payment the last time they spoke, apparently a reference to the conversation CC-1 had with the undercover officer on August 13, 2009. PAI told CC-1 he would call the undercover officer and advise him of the terms. At approximately 20:46 hours, CC-1 contacted PAI by telephone. CC-1 told PAI to "just play the game with him and stuff like that" and re-iterated the terms to PAI, stating that the undercover officer would have to pay $10,000 up front and that if the undercover officer bought "5 boats," he could get them for $5 per pill. PAI asked CC-1 when the undercover officer could receive the pills. CC-1 told PAI that the undercover officer would have to wait until the next day to get the pills. Based on the experience of an undercover officer familiar with the distribution of MDMA, your affiant believes "5 boats" refers to 5,000 MDMA pills and when CC-1 told PAI to "just play the game with him and stuff like that," your affiant believes that CC-1 was directing PAI to negotiate terms with the undercover officer that were favorable to CC-1 and PAI.

17.     On November 25, 2009, at approximately 21:52 hours, PAI called the undercover officer, telling him he would have to buy 5,000 pills if he wanted a price of $5 per pill, saying, "If you want each pizza to be 5, you'd have to get 5k and then if you want to get it, you have to give me 10k up front and you get it the next day." The term "pizza" was used as a code word for MDMA pills and "10k" was a reference to a $10,000 down payment. PAI relayed to the undercover officer that his "boy" had already instructed the undercover officer as to the terms and having to front part of the payment for such a large order. The undercover officer expressed concern over fronting $10,000. PAI told him he would talk to his source to try to work something out. At approximately

22:38 hours, PAI talked with CC-1 regarding the conversation with the undercover officer.

18.     PAI continued to negotiate with the undercover officer on November 27, 2009. During a call made at approximately 19:30 hours, PAI told the undercover officer, "The only way to do it if you want is to have the 10 up front." However, PAI also told the undercover officer if he agreed to get "5k for 5 each" and was "100%" sure he was going to get it, he might not have to put any money down at all.  In other words, PAI indicated to the undercover officer that if he wanted to buy 5,000 MDMA pills for $5 per pill and was committed to the deal, he could possibly avoid having to "front" the money.  At approximately 20:01 hours, the undercover officer called PAI back and asked PAI to have his "man" call him directly so they could make this happen.  That evening, a surveillance team followed PAI from Northern Virginia to CC-1's business in Seat Pleasant, Maryland.  At approximately 21:56 hours, PAI called the undercover officer. PAI told the undercover officer that he "got what he asked for." CC-1, using PAI's telephone, then began talking directly with the undercover officer, who expressed concern with fronting the money.  CC-1 told the undercover officer that the down payment was needed to demonstrate he was serious about the order.  The undercover officer continued to express concern with giving an unknown person $10,000, to which CC-1 commented, for all he knew, the undercover officer could be the police.  The undercover officer denied this, and CC-1 continued to negotiate with him.  Eventually the undercover officer agreed to front $10,000 if CC-1 would give him a price of $4.75 per pill, to which CC-1 agreed.  CC-1 told the undercover officer that he would have to give the money to "Jon" before receiving the pills.

9

19.    On December 2, 2009, at approximately 00:19 hours, PAI sent the undercover officer a text message saying, "You ready to hang out?" PAI and the undercover officer spoke later that day and agreed to meet the following day, December 3, 2009, at 16:00 hours at the Tysons Corner Center shopping mall located in McLean, Virginia, in order to consummate the drug transaction.

20.    On December 2, 2009, at approximately 18:15 hours, PAI called Tofun Ali GHASRI and offered to pay him $200 to help him out with meeting "someone" at Tysons who he (PAI) did not trust. PAI said he would need his help the following day between "4 to like 5 or 4 to 6", a reference to the time (16:00 hours to 17:00 hours, or 16:00 hours to 18:00 hours) that PAI expected to meet with the undercover officer at the Tysons Corner Center shopping mall. GHASRI agreed to help and asked PAI to buy him a timer from Wal-Mart or Home Depot on his way over. PAI asked if GHASRI wanted a "light timer," and GHASRI replied that it was actually just considered a timer and recommended that PAI buy a decent one. Based on your training and experience and on this investigation and related interceptions, your affiant believes this to be a reference to equipment used in a marijuana grow operation at GHASRI's residence in Manassas, Virginia. A surveillance team later observed PAI at GHASRI's residence in Manassas, Virginia.

21.    On December 3, 2009, at approximately 15:44 hours, PAI called the undercover officer and asked the undercover officer if they were still hanging out today, to which the undercover officer responded in the affirmative. The interior surveillance team observed PAI inside the mall. The interior surveillance team also observed GHASRI in the food court area of the mall. GHASRI was sitting near the "Desert Moon"

Restaurant. GHASRI had with him a pink bag, which was placed on the table in front of him. At approximately 16:06 hours, the wire room relayed to the surveillance teams that PAI told the undercover officer to come into the food court.

22.     At approximately 16:10 hours, the interior surveillance team observed the undercover officer meet with PAI in the food court. The undercover officer handed PAI a Motorola cell phone box containing $10,000 in OAF as per the prior arrangement with PAI. At that point, PAI walked away. GHASRI and PAI spoke on the telephone. GHASRI told PAI that he had taken the money out of the box and thrown the box underneath a car because he thought the box might contain a tracking device. The interior surveillance team observed GHASRI watching the undercover officer inside the food court area and then PAI and GHASRI began walking away while talking on their cell phones.

23.     At approximately 16:12 hours, the undercover officer walked toward the mall exit. The undercover officer walked out of the mall and got back into his vehicle. Your affiant observed GHASRI looking in the direction of the parking lot where the undercover officer was located. Your affiant and the exterior surveillance team observed GHASRI in what appeared to be a light-green vehicle driving by the undercover officer's vehicle. GHASRI called PAI as previously directed and provided PAI with the undercover officer's vehicle make/model and license plate number. GHASRI then drove toward the lower level of the parking garage. GHASRI was later observed by the exterior surveillance team back on the top level of the parking garage, approximately 100 yards away from the undercover officer's vehicle.

24.     PAI called the undercover officer and told him to come back inside the mall to complete the MDMA transaction. At approximately 16:55 hours, the undercover officer walked back up the pedestrian ramp towards the mall entrance. At approximately 16:57 hours, the interior surveillance team observed PAI carrying two bags. PAI met with the undercover and completed the transaction by handing the undercover a bag containing approximately 4,000 suspected MDMA pills. PAI then called CC-1 and told him the transaction was completed.

25.     At approximately 17:00 hours, the undercover officer confirmed that the 4,000-pill MDMA transaction had been completed without incident. The undercover officer departed from the mall followed by his cover team who observed the vehicle driven by GHASRI following the undercover officer. GHASRI called PAI while he followed the undercover officer along Leesburg Pike (Route 7) to I-495. GHASRI broke off his surveillance once the undercover officer took the northbound entrance ramp of I-495 towards Rockville, Maryland.

26.     At approximately 17:02 hours, interior surveillance teams observed PAI discard the bag and carry the Garmin GPS box containing $9,000.00 of OAF into a nearby bathroom. Interior surveillance subsequently recovered the Garmin box from the trash inside the men's bathroom.

27.     At approximately 17:18 hours, TFO Farhan observed PAI near his silver-colored Toyota Highlander parked in the garage on the opposite side of the mall.

28.     At approximately 17:25 hours, exterior surveillance observed PAI, driving his Toyota Highlander and GHASRI, driving the light green vehicle away from the parking garage.

12

29.     At approximately 17:39 hours, PAI received an incoming text message from CC-1 which read, "When you come by to pick up ur paycheck?"  Since PAI is not employed by CC-1, your affiant believes that CC-1 wanted to know when PAI was coming over so they could split the proceeds and PAI could receive his share.  At approximately 17:59 hours, surveillance located PAI's Toyota Highlander parked and unoccupied in the parking lot of the Tysons Sheraton Premier hotel located at 8661 Leesburg Pike, Vienna, Virginia.  PAI called Paul BANG who told PAI to come to room #1516 of the Sheraton Premier to count the money provided by the undercover officer.

30.     At approximately 19:10 hours, surveillance observed PAI get into the Toyota Highlander with BANG who was wearing a dark suit and was carrying a bag.  They departed from the Sheraton hotel and were followed by the surveillance team.  PAI and BANG while under surveillance traveled to the "TGI Fridays" restaurant located off of Fair Lakes Parkway near West Ox Road in Fairfax County, Virginia.

31.     At approximately 21:19 hours, surveillance observed PAI and others walk out of the restaurant.  PAI got into his Toyota Highlander and departed from the "TGI Fridays."  PAI was followed and was under surveillance when he arrived at CC-1's business in Seat Pleasant, Maryland, at approximately 22:28 hours.  PAI called CC-1 to tell him that the police were present on a traffic stop across the street from his business.

32.     At approximately 22:30 hours, surveillance observed PAI standing outside his Toyota Highlander at CC-1's business.  Then, CC-1 arrived in his burgundy Honda Ridgeline.  Surveillance observed PAI retrieving an item out of the back seat of the Toyota Highlander as CC-1 walked over toward the Highlander.  PAI and CC-1 then went inside CC-1's business.

33.     On December 4, 2009, at approximately 01:01 hours, CC-1 received an incoming call from Tam Phuong TRAN.  During the conversation, CC-1 relayed to TRAN what PAI had reported to him regarding the sequence of events surrounding the drug transaction conducted with the undercover officer.  CC-1 told TRAN that "the guy" actually brought the money and when "Jon" called him back in, he gave PAI an empty GPS box containing "the stuff inside."    CC-1 told TRAN that Jon gave the guy (undercover officer) a Macy's bag, saying that PAI told the undercover officer he brought a gift from Macy's for the undercover officer's girlfriend.  CC-1 relayed to TRAN that Jon's friend (GHASRI) followed the undercover officer after the deal.  Later in the conversation, TRAN asked CC-1 about the profit made.  CC-1 answered, "6, 7."  CC-1 explained that he gave some to Jon [PAI].  TRAN asked, "8 is the total?" and, "damn, that's all you guys make?"  CC-1 replied, "It's a lot babe."  TRAN then said, "Yeah, but for 5,000?"  CC-1 responded, "It was only 4," to which TRAN replied, "Oh."  CC-1 explained to TRAN that "if it was 5, I would have made 10 and I would have made 8 and Jon, ah, Jon would have made like 2."   Later in the conversation, TRAN commented to CC-1 that it "sucked" that they decided to "take a break," an apparent reference to their decision to slow down their drug trafficking activities for the time being.  During this conversation, it is believed that CC-1 explained to TRAN that he and PAI sold the undercover officer 4,000 pills for a total profit of $8,000.  CC-1 made $6,700 and PAI made $1,300.  Had they sold 5,000 pills as originally planned, the total profit would have been $10,000, of which CC-1 would have received $8,000 and PAI would have received $2,000.

34.     On December 4, 2009, at approximately 15:13 hours, GHASRI called PAI. GHASRI said, "I have money for you." PAI replied, "I have money for you too." PAI told GHASRI he had 200 for him, an apparent reference to the payment PAI promised to GHASRI for helping him conduct the meeting with the undercover officer on December 3, 2009. Eventually PAI agreed to deduct $200 from what appeared to be an existing drug debt owed to him by GHASRI.

35.     On December 13, 2009, CC-1, by sending and receiving text messages, was arranging to have a co-conspirator drive him from Washington, D.C., into Virginia with marijuana he had obtained for distribution. At approximately 9:06 p.m., CC-1 called PAI. During the conversation, CC-1 indicated to PAI that he was looking for a place to store the marijuana. CC-1 also told PAI that he was going to eat at Yechon (a restaurant located in Annandale, Virginia). At approximately 21:46 hours, a surveillance team member located the vehicle in which CC-1 was traveling in the parking lot in front of Yechon. At approximately 22:29 hours, PAI arrived at the restaurant and went inside. At approximately 23:00 hours, the surveillance team followed PAI from the restaurant to a Comfort Suites hotel located in Chantilly, Virginia. Based on intercepted calls and texts outlined above, and physical surveillance, your affiant believes that CC-1 obtained the marijuana earlier that day.

36.     On December 14, 2009, at approximately 00:22 hours, GHASRI spoke to PAI who gave GHASRI directions to the Comfort Suites. At approximately 00:25 hours, surveillance observed GHASRI walking into the hotel carrying a bag. GHASRI was observed walking back out of the hotel at approximately 00:41 hours without the bag. PAI departed the hotel at approximately 00:50 hours with the bag. During subsequent

phone calls, PAI spoke with Paul BANG and arranged to meet him in the Centreville area. The surveillance team followed PAI from the hotel to the Centreville area, where it is believed he met with BANG.  At approximately 01:28 hours, PAI called BANG and asked, "It's fire?" to which BANG replied, "Yeah."  PAI asked, "You sure?'  Again BANG replied, "Yeah."  PAI asked BANG, "You like it?"  BANG answered "Huh, yeah."  PAI then asked, "So does that mean you can move it faster?" and BANG replied, "Yeah probably, I mean I'll try."  Your affiant believes that GHASRI met with PAI and CC-1 at the hotel in order to further their marijuana trafficking activities.  Your affiant also believes that a portion of the marijuana obtained by CC-1 earlier that day was provided to PAI at the Comfort Suites.  Your affiant believes the term "fire" referred to the high quality nature of the marijuana, which PAI subsequently distributed to BANG. BANG was apparently pleased with its quality and as a result, believed he would probably have an easier time selling it.

37.    At approximately 02:14 hours, CC-1 sent the following text message to an unidentified person, "Yo gi hit me up on this phone when ur here. Sully 7-11." At approximately 02:23 hours, an unidentified person responded to CC-1 by text message, "Iuma b thwre in 10 mins ime be wit my grl jst fyi." CC-1 replied via text message, "Thank u for telling me ur girl come. It s cool." The unidentified person sent CC-1 a text message saying he would be there in a couple of minutes, and CC-1 replied, via text message, "K coming down." At approximately 03:05 hours, your affiant observed CC-1 talking with a male in front of the 7-11 located in Chantilly, Virginia, which is next to the aforementioned Comfort Suites hotel. Moments later, the male departed from the 7-11 in what appeared to be a blue, older model Acura Integra. Your affiant believes that CC-1

set up a meeting with an individual referred to as "G" for the purpose of providing him with a sample of the marijuana CC-1 had obtained. At approximately 03:13 hours, CC-1, called TRAN. CC-1 told TRAN that a person named "G" was getting marijuana from another supplier who was very demanding and had low quality marijuana. CC-1 told TRAN that he told "G" he had "2 shirts" as a sample and that he gave some to "G." TRAN asked how much, "An onion?" and CC-1 replied that he gave "G" about an eighth. CC-1 told TRAN that "G" remarked that the marijuana looked pretty good, noting the presence of crystals. CC-1 told TRAN that he wanted to know if "G" could move 3-5 "shirts" in a week, saying that his price would be about $6,000 per pound and that "G" could sell each ounce for between $375 and $400. TRAN was concerned about people "snitching" on him, but CC-1 felt that "G," who apparently cooperated with law enforcement in the past, had learned his lesson. Your affiant believes, based on the December 13 intercepts and corresponding surveillance, that CC-1 acquired a sample amount of high grade marijuana and brought it into the Eastern District of Virginia, where he divvied it up among PAI and others, including the individual referred to as "G." Although CC-1 did not use the term "marijuana" explicitly, your affiant believes that "shirts" was used by CC-1 as a code word for pounds of marijuana and "onion" was used by TRAN as a code word for an ounce of marijuana. Furthermore, it appears that CC-1 planned to broaden his distribution network by recruiting additional retail dealers interested in selling high quality marijuana.

38.     On December 18, 2009, at approximately 13:52 hours, GHASRI called and spoke with PAI. GHASRI advised that he was about to run out of the "stuff" that PAI gave him. PAI asked if GHASRI was referring to the "Shitty shit." GHASRI replied that

people complained to him (GHASRI) via text messages about the poor quality. Later in the conversation, PAI asked GHASRI why he had not purchased marijuana from R.C. GHASRI replied, "Huh? Because I'd . . . rather do business with you." PAI and GHASRI discussed prices for "zips" of marijuana, and the timing for future deals.

39.     On January 13, 2010, at approximately 18:17 hours, BANG called PAI, and PAI asked BANG if he had any loot. BANG responded that he was getting some together right then and that he only had "three something". Your affiant believes "three something" to be a little over $3,000. At approximately 18:42 hours, GHASRI sent a text message to PAI stating "Yo I have all your loop $". PAI asked GHASRI where he was, and GHASRI said that he was at home and that PAI should come over and see "the babies." GHASRI was attempting to grow marijuana at his home, and your affiant believes "the babies" referred to marijuana plants in their various stages of growth. Based on the investigation, your affiant believes PAI is an investor/partner in the indoor marijuana grow operation with GHASRI.

40.     On January 13, 2010 at approximately 20:17 hours, Quang Huy HO, identified as "G," sent a text message to PAI stating "Wha up @$," and PAI responded "You have the loot?" "G" responded via text message to PAI in the affirmative. PAI then asked "G" if PAI gave him the other half of the marijuana how long would it take for "G" to sell it. "G" responded via text message to PAI that it would be Friday at the latest. PAI then sent a text message to "G" that he would be by G's residence in Fairfax, Virginia in about 30 minutes. "G" and PAI discussed the fact that it might take PAI more than 30 minutes to get to "G"'s house and "G" had to work at 22:00 hours. "G" said that was okay, that his girl was home, and that she could handle the transaction. PAI contacted

18

BANG and instructed BANG to go into PAI's duffle bag that was in BANG's room, get two bags out and leave the extra ones in the duffle. PAI told BANG he would be there in five minutes. At approximately 20:58 hours, PAI called "G" and told him that he was outside his house.

41.     On January 13, 2010, Jeff TSU called PAI at approximately 21:46 hours, and they had a conversation in English and Mandarin about the Audi that TSU sold to CC-1 that CC-1 had not paid TSU for yet. During the conversation PAI got confused and asked TSU "are you talking about marijuana or the car?" Later in the conversation TSU asked PAI if he could help him out with some "grass." PAI asked him if it was the same grass that TSU had given PAI. TSU responded "nope did I give you anything? No" and PAI said to TSU " the two pounds that I gave back to you." TSU said no that this is the White Spider. PAI asked TSU how many and TSU responded that he had almost three pounds right now. PAI told TSU that he couldn't take it because he had to wait until CC-1 came back from California the next day. TSU told PAI that he had already talked to CC-1 and that CC-1 had told him no because TSU's price was not cheap enough. TSU told PAI that the stuff that PAI had is good and the price good but it is not the best. TSU told PAI the stuff that TSU had is not cheap but it is really good. PAI asked how much it was per pound, and TSU said that "one ring is $425.00" meaning $425.00 per ounce. PAI asked what the total price was and TSU said $425 x 60 (60 ounces), the total being $25,500.00. PAI told TSU that it was too expensive. TSU told PAI he would give it to him for $400.00 per ounce but PAI could not tell CC-1.

42.     At approximately 21:57 hours, PAI called CC-1 and told him everything that TSU said to PAI.  CC-1 told PAI to tell TSU that if CC-1 did not make money that PAI was not going to do it.

43.     On January 14, 2010, CC-1 received a call from PAI, and CC-1 told PAI that he was trying to teach him the drug business and PAI had to decide what he wanted to do in reference to TSU.  Later PAI called TSU and told TSU that his people did not need any marijuana right now and PAI would let him know later.  TSU told PAI that his guy had it all the time and that getting marijuana from elsewhere did not make the price that much different.

44.     At approximately 13:45 hours, CC-1 sent a text message to PAI asking "Do you have all the paper work yet? P," and PAI responded "Tomorrow."  CC-1 immediately sent PAI another text message and said "Need whatever you have tonight@."  PAI then attempted to make collections for all outstanding drug debts, and he contacted GHASRI.  GHASRI agreed to meet PAI at the Panda Express restaurant in Centreville, Virginia.  Surveillance was established at the Panda Express restaurant, and TFO Ohr observed PAI at the location.  Shortly thereafter, GHASRI arrived at the Panda Express in his Jeep, and PAI approached GHASRI in his vehicle.  TFO Ohr saw GHASRI hand PAI a handful of money, and PAI put it in the pocket of his shorts.  PAI then contacted BANG and sent him text messages inquiring about the money that BANG owed PAI.  BANG told PAI that he was waiting on one but BANG said "I got 3 for u."  PAI responded that he would be by in a bit.

45.     On January 15, 2010, at approximately 00:05 hours, PAI sent CC-1 a text message asking if he should meet CC-1 on Route 29.  PAI then sent a message to CC-1

that most of the money was at PAI's house.  At approximately 00:31 hours, PAI called CC-1, and CC-1 told PAI that he was leaving the airport and additionally asked if PAI was able to contact another person who owed money.  PAI told CC-1 that he was working on it.  PAI told CC-1 that he had collected from "G" and BANG.  PAI said he had almost $10,000.00 and that he had $5000.00 at his residence.  Then, he said he thought he had around $12,000.00.  PAI also stated that "G" was going to pay $3200.00 tomorrow, and the other person should pay $1400.00.  CC-1 then said that "G" still owed $3000.00.  CC-1 then got directions from PAI to get to his house in Fairfax, Virginia, from the airport.  Surveillance was established, and CC-1 was observed leaving PAI's house in an Audi.  Surveillance was conducted and was terminated when CC-1 arrived at his residence in Maryland.

46.     Surveillance operations have corroborated information gleaned from intercepted calls regarding the use of BANG's residence in Centreville, Virginia, as a "stash house." For example, on January 18, 2010, at approximately 15:15 hours, PAI received the following text message from BANG, "Did u get it? I have lots of people hitting me up." PAI replied via text message, "Yea 0."  At approximately 18:55 hours, PAI sent the following text message to "G": "You want any? A," to which "G" replied via text, "Same shirts?"  At approximately 18:58 hours, PAI called "G" and stated, "It's not the same. This time it's white widow.  The thing is it's from different people, so...it's uh...it's not our usual people.  It's different, so it's 4."  PAI continued to talk with "G", explaining that they were going to go back to their "normal people" in a couple of days if "G" wanted to wait until then.  Your affiant believes PAI was quoting a price of $400 per ounce for the "white widow" brand of marijuana.  At approximately 7:01 p.m., PAI

21

received an incoming call from GHASRI.  During the conversation, GHASRI told PAI, "I should be around Paul's at around 8:30, 8:45 at the latest."  PAI told GHASRI, "Hit me up when you're ready to go to Paul's later."  At approximately 20:21 hours, PAI called BANG and told him to "Make sure Tofun's 3 are sealed in a vacuum thing."  PAI continued, telling BANG, "I think 'G' is going to take the other half tomorrow."  At approximately 20:34 hours, GHASRI called and told PAI he had "just pulled onto the street."  PAI then called BANG and told him to go home "real quick."  PAI called GHASRI back and told him that [Paul] was going to be there real soon.  GHASRI replied that he would be in his (Paul's) driveway.  At approximately 20:37 hours, surveillance observed GHASRI's vehicle arrive at the "stash house," where it is believed GHASRI met with BANG.  GHASRI was followed back to his residence in Manassas, Virginia, after leaving BANG's home.  At approximately 21:54 hours, GHASRI sent the following text message to PAI, "Looks good."

47.     On January 19, 2010, at approximately 00:41 hours, PAI received the following text message from "G" stating, "Yo it was 2 short."  PAI asked via text message, "Gs right? X" and "G" responded by text, "Yea."  Later that day, at approximately 17:00 hours, PAI called GHASRI.  In this conversation, GHASRI complained that the marijuana PAI supplied to G and GHASRI was weighed incorrectly, being approximately 2 grams short for each bag of marijuana sold as an ounce (28 grams).

48.     On January 21, 2010, at approximately 13:29 hours, PAI sent the following text message to "G," "Do you want the half0 >."  "G" replied that he did not have a car at the moment, so PAI sent him the following text message, "Ill come to you later @."  At approximately 18:43 hours, PAI sent the following text message to BANG, "Ok well, I

need my box soon P." BANG replied via text, "Ok." PAI called BANG approximately

10 minutes later. BANG asked, "When do you need it?" PAI answered sometime within

the hour. PAI asked BANG, "Where is it right now, in your car?" BANG told PAI he

put the box downstairs. PAI told BANG to "hide it in your garage somewhere and then

I'll come by there. I'll just go to the garage and just open the garage or something." At

approximately 19:19 hours, PAI sent the following text message to BANG, "Does the

box smell 0," to which BANG replied by text, "My nose is stuffy I cant smell@." At

approximately 20:27 hours, "G" called PAI and said he had $4,000 ready for PAI to pick

up. PAI told "G" he would collect the remaining balance later. At approximately 20:36

hours, PAI sent the following text message to BANG, "I m coming to get the box first.

Be there in two." Two minutes later, PAI called BANG. BANG told PAI he would have

his brother open the garage and told PAI, "It's on the left, like towards the door." At

approximately 20:40 hours, a surveillance agent observed PAI arrive at BANG's

residence and back his Toyota Highlander up to the garage. The garage door opened.

PAI was observed walking out of the garage carrying a package with his left arm. PAI

placed the package into the passenger compartment of the vehicle on the rear of the

driver's side and then departed. At approximately 20:48 hours, PAI called "G" and said,

"Hey, I'm going to be outside in like 20 seconds." "G" asked PAI if he wanted to come

inside, but PAI told "G", "Can we do this quick 'cause I have to go and eat right now,

I'm kind of late." PAI told "G", "It's in a box again so if you just want to come to the car

and grab it," to which "G" replied, "Alright, cool. I'll do that." Surveillance observed

PAI in Fairfax, Virginia where it is believed that he gave the box to "G". In these calls, it

is believed that PAI arranged to pick up a box containing marijuana from BANG's

residence in Centreville. PAI then delivered the box containing the marijuana to "G" in Fairfax, Virginia. It appears that PAI wanted BANG to reassure him that no odor of marijuana emanated from the box before he picked it up from the "stash house" and delivered it to "G".

49.     On January 23, 2010, at approximately 16:40 hours, PAI called "G." "G" told PAI he was getting a haircut in Centreville and would return to his home when he was finished to get the money he owed PAI. A surveillance team located the hair salon in Centreville and followed "G" back to Fairfax, Virginia. At approximately 17:57 hours, PAI sent the following text message to "G", "I m outside 0." At approximately 17:58 hours, agents observed PAI's Toyota Highlander departing from "G"'s residence in Fairfax, Virginia.

50.     On January 25, 2010, PAI called TSU and asked if the "five people" are at home. TSU replied in the affirmative. Based on training and experience and this investigation, your affiant understands this to indicate PAI was asking TSU if TSU had the five pounds of marijuana at his residence in Vienna, Virginia. Surveillance was established at TSU's residence. At approximately 16:22 hours, PAI called TSU and said he was outside. You affiant witnessed PAI enter TSU's residence. Your affiant saw PAI subsequently leave the residence carrying an object and place that object in the rear area of his vehicle. PAI then left and traveled to the residence of BANG. PAI entered the residence and later, in a call with CC-1, PAI stated that it was "bad quality. CC-1 asked "why did you take it?" and directed PAI to return it. Your affiant understood this to indicate the quality of the marijuana obtained from TSU was poor, and CC-1 was instructing PAI to return it to TSU. Approximately five minutes later, PAI called TSU

and stated "This shit sucks. It tastes like ether. I opened it and checked. It's not the AK stuff." PAI then stated he would return the marijuana to TSU's residence in Vienna, Virginia, and confirmed that TSU would be present at his home the remainder of the evening. At approximately 19:18 hours, PAI called TSU and confirmed TSU was home and stated that he would be at TSU's residence in approximately 30 minutes. At approximately 19:36 hours, PAI again called TSU and stated he was outside. Surveillance identified PAI outside TSU's residence.

51.     On January 28, 2010, PAI called TSU, and TSU asked PAI to bring "the machine" over to his residence. The remainder of the call indicated the machine was a device used to package marijuana. PAI and TSU discussed the machine and related materials and confirmed that the items were at another residence. PAI subsequently called BANG, confirmed BANG had the "sealer" at his residence, and indicated he would go there to pick up the equipment. In a subsequent call, both confirmed the device was a vacuum sealer. Surveillance confirmed PAI meeting with BANG thereafter and then PAI traveling to TSU's residence. When there, PAI confirmed he was present, and TSU instructed PAI to enter with the sealer. Later on January 28, TSU again spoke with PAI and indicated he was in possession of better quality marijuana at his residence.

52.     On January 29, 2010, CC-1 contacted a source of supply and told him they had sold about 200 pounds of marijuana over the last four months. CC-1 and this source of supply discussed prices for marijuana. CC-1 also told this source of supply one of his customers wanted 20,000 pills. The source of supply told CC-1 he only had 10,000 pills.

53.     On the evening of January 31, 2010, continuing into the early morning of February 1, 2010, Virginia State Police made a traffic stop on PAI and CC-1 and seized

PAI. Based on telephone intercepts, your affiant knows that CC-1 intended to purchase 5-10 pounds of marijuana from one of his sources of supply.

54.     After arrest, CC-1 was advised of his rights, acknowledged understanding them, waived them, and agreed to speak with law enforcement. CC-1 stated that he and others distributed approximately 500 pounds of marijuana and approximately 50,000 Ecstasy during the past year. CC-1 identified PAI as a co-conspirator and principal distributor of both Ecstasy and marijuana supplied by CC-1 and TSU as a co-conspirator and principal distributor of marijuana supplied by CC-1. CC-1 identified BANG as a co-conspirator and marijuana distributor who was supplied by PAI.

55.     Quang Huy HO was identified by your affiant as the individual referred to herein as "G" by a comparison of surveillance identification of "G" with a photo registration from the Virginia DMV for Quang Huy HO. That information was matched to vehicle registration information. Further, Quang HO was arrested on February 26, 2010, at which time he acknowledged his name was Quang Huy HO and that he was also known by the nickname "G." HO's brother also confirmed this information.

## **CONCLUSION**

Based on the foregoing facts, there is probable cause to believe that Jonathan Pai,

Tofun Ali Ghasri, Paul Bang, Jeff L. Tsu, and Quang Huy Ho, also known as "G," and

others have engaged in a conspiracy to distribute:

(1)     a mixture and substance containing a detectable amount of
3,4 methylenedioxymethamphetamine (MDMA), commonly known as
Ecstasy;

and

(2)     100 kilograms or more of a mixture and substance containing a detectable
amount of marijuana;

in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

I swear and subscribe to the information contained in this Affidavit:


Edmund J. Kelly
Task Force Officer
Drug Enforcement Administration

SUBSCRIBED AND SWORN before me this 26th day of February 2010.


/s/
Ivan D. Davis
United States Magistrate  Judge

27